**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| PHYLLIS JACKSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 09-5046-CV-SW-RED |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court held a bench trial in this matter on the 22nd and 23rd of February, 2010. Having heard the testimony of the parties and witnesses, reviewed all of the evidence, and reviewed the parties' trial briefs and proposed findings of fact and conclusions of law, the Court hereby enters the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACTS

**I.     Parties and Nature of the Case**

    **A.     Bill and Phyllis Jackson**

1. Plaintiff Phyllis Jackson is a resident of Newton County, Missouri. Plaintiff's husband, William C. "Bill" Jackson, passed away in early February 2009.

2. Phyllis Jackson was married to Bill Jackson for more than fifty (50) years before he passed away in February 2009.

3. During their marriage, Bill Jackson was primarily responsible for managing the family finances.

4. Bill Jackson and Phyllis Jackson treated all income and property obtained by them during their marriage as jointly owned by the couple.

### B. Source of Proceeds Used to Purchase the Vehicle

5. Prior to June 13, 2003, Bill and Phyllis Jackson jointly owned certain real property located in Newton County, Missouri (the "Property").

6. On or about June 13, 2003, Bill and Phyllis Jackson sold the Property to Billy Ray "Bill" Harvill and Kristi Harvill for the sales price of $310,000.00.

7. At closing, on or about June 13, 2003, Bill and Phyllis Jackson received sale proceeds in the sum of $308,934.91 in the form of a settlement check made payable to "William C. Jackson and Phyllis Jackson" (the "Sales Proceeds").

8. At all times relevant to the sale of the Property and the purchase of the Vehicle, Bill and Phyllis Jackson owned a bank account (No. 1032275) at Community Bank & Trust in Neosho, Missouri (the "Jacksons' Bank Account").

9. During this same period, Bill and Phyllis Jackson were also the owners of a First Bankcard credit card in the name of "William C. Jackson [and] Phyllis M. Jackson." (the "Jacksons' Credit Card").

10. On the day of the closing, June 13, 2003, Bill and Phyllis Jackson deposited the Sales Proceeds into the Jacksons' Bank Account, as evidenced by Community Bank & Trust deposit slip, dated June 13, 2003, in the sum of $308,934.91, for account no. 1032275.

### C. Bill Jackson Withdraws $300,000 in Cash from the Jacksons' Bank Account

11. On July 16, 2003, approximately one month after closing on the Property, Bill Jackson withdrew $300,000.00 of the Sales Proceeds in cash from the Jacksons' Bank Account, as evidenced by Community Bank & Trust withdrawal slip, dated July 17, 2003, in the sum of $300,000.00, for account no. 1032275.

### D. Bill Jackson Travels to Texas to View Classic Car for Possible Purchase

12. On or about July 18, 2003, two days after withdrawing $300,000.00 in cash from the Jacksons' Bank Account, Bill Jackson traveled with William P. "Phil" Jackson to Texas to look at a classic Mopar automobile (Chrysler manufactured muscle car) for possible purchase.

13. Phil Jackson is the son of Bill and Phyllis Jackson.

14. Bill Jackson took the $300,000.00 in cash he withdrew from the Jacksons' Bank Account with him on the trip to Texas.

15. During the trip to Texas, Bill Jackson used the Jacksons' Credit Card to pay for miscellaneous expenses in connection with the trip, including a room at Holiday Inn in Del Rio, Texas, on July 18, 2003.

16. No vehicle was purchased on the trip to Texas.

**E.     Bill Jackson Travels to Wisconsin to Purchase the Vehicle**.

17. On or about August 15, 2003, approximately one month after withdrawing $300,000.00 in cash from the Jacksons' Bank Account, Bill Jackson traveled with Phil Jackson to Wisconsin to look at the Vehicle at issue in this case (a 1969 Dodge Charger Daytona, Vehicle Identification Number XX29J9B383276) for possible purchase. Bill Jackson used the Jacksons' Credit Card to pay for miscellaneous expenses in connection with the trip, including a room at Howard Johnson's in Milwaukee, Wisconsin, on August 15, 2003.

18. Bill Jackson took the $300,000.00 in cash he withdrew from the Jacksons' Bank Account with him on the trip to Wisconsin.

**F.     Dr. Flatley's Ownership and Sale of the Vehicle**

19. The Vehicle was owned by Dr. T.J. Flatley at the time Bill Jackson and Phil Jackson traveled to Wisconsin in August 2003 to look at the Vehicle.

20. On or about August 15, 2003, Bill Jackson and Phil Jackson met Dr. Flatley at Dr.

Flatley's storage building to look at the Vehicle for possible purchase.

21. During the meeting at Dr. Flatley's storage building on or about August 15, 2003, Dr. Flatley agreed to sell the Vehicle to Bill Jackson for $250,000.00.

22. At the same meeting, Dr. Flatley accepted $250,000.00 in cash from Bill Jackson as payment for the Vehicle.

23. After the Vehicle was purchased, Bill Jackson and Phil Jackson returned to Missouri. The Vehicle remained in Milwaukee at Dr. Flatley's storage building.

G. **Bill Jackson Deposits $50,000 into Jacksons' Bank Account**

24. Upon his return to Missouri, on or about August 18, 2003, Bill Jackson deposited $50,000.00 in cash into the Jacksons' Bank Account.

H. **Transporting the Vehicle from Wisconsin to Missouri**

25. Approximately two weeks after Bill Jackson purchased the Vehicle, Phil Jackson and his wife, Sharon Jackson, traveled to Milwaukee with a trailer, took possession of the Vehicle from Dr. Flatley, and transported the Vehicle to the home where Phil and Sharon Jackson reside in Newton County, Missouri ("Phil Jackson's Home"). Phil Jackson's home is located a few miles from the home of Bill and Phyllis Jackson, also in Newton County.

26. Bill Jackson was present at the time the Vehicle arrived at Phil Jackson's Home, where he inspected the Vehicle and, according to two witnesses, behaved in an excited manner much like a child with a new toy.

I. **Vehicle Entrusted to Phil Jackson.**

27. Phil Jackson has a strong, long standing interest in classic Mopar-type cars, and he has owned at least three such automobiles.

28. Phil Jackson has a weatherproof storage building capable of storing the Vehicle at

his home. His parents, Bill and Phyllis Jackson, did not and do not have a weatherproof building capable of storing the Vehicle.

29. Phil Jackson has experience and knowledge about how to maintain a classic car like the Vehicle. His parents did not and do not have similar experience or knowledge.

30. Phil Jackson agreed to and did help his parents locate, inspect, purchase, store, maintain and market the Vehicle.

31. Phil Jackson also stored, maintained and marketed the Vehicle for sale on his parents' behalf from approximately August 2003 until approximately August 2008. During this time, Phil Jackson obtained some reports on the Vehicle describing its rarity and took the Vehicle to at least one car show.

32. The Vehicle was primarily stored in a weatherproof building located at Phil Jackson's Home between August 2003 and August 2008.

33. Sometime in or around 2005, Phil Jackson obtained an offer for the Vehicle for $700,000.00. Phil Jackson took this offer to his parents for their consideration. Bill Jackson rejected the offer.

**J.     The Title**

34. In connection with his purchase of the Vehicle, Dr. Flatley received an original State of Indiana Certificate of Title for the Vehicle, dated May 27, 1988 (the "Title").

35. The Title was issued by the State of Indiana to "David W. & Julie M. Jones," whose names appear in type written print on the front of the Title.

36. The Title appears to contain two original signatures for David W. Jones and Julie M. Jones on the back of the Title under the section labeled "sellers".

37. Dr. Flatley gave the Title to Bill Jackson along with some other paperwork related

to the Vehicle.

38. Bill Jackson stored the Title and other Vehicle-related paperwork in a safe in Plaintiff's home at nearly all times between the date of purchase and the time the Vehicle was taken to Lost 'N The 50's in August 2008. On approximately three occasions during this time period, Phil Jackson had possession of the Title and other Vehicle-related paperwork for limited periods of time for use in connection with his efforts to market the Vehicle on behalf of his parents.

39. The Title is signed by both Bill Jackson and Phyllis Jackson on the back of the Title under the section labeled "purchasers."

40. Phyllis Jackson signed the Title at her husband's request in the Fall of 2008. At the time she signed the Title, the Title already contained the signature of Bill Jackson.

41. Plaintiff located the Title in a safe at her home following the seizure of the Vehicle in March 2009.

### K.     The Agreement Between Bill Jackson and Phil Jackson

42. On or about September 1, 2003, Bill Jackson drafted a hand-written document in which he wrote that: (1) he purchased the Vehicle for the sum of $250,000.00; (2) if the Vehicle sold within one year, on or before September 1, 2004, Phil Jackson would receive 50% of the net profits of the sale above and beyond the original purchase price; and (3) Phil Jackson could purchase the Vehicle within one year, on or before September 1, 2004, for the original purchase price of $250,000.00.

43. The agreement was signed by both Bill Jackson and Phil Jackson on September 1, 2003.

44. The Vehicle was not sold to Phil Jackson or to any other person on or before

September 1, 2004.

**L.     Bill Jackson's Health in the Summer and Fall of 2008**

45.     Bill Jackson was diagnosed with cancer in or around late 2003 or early 2004.

46.     Bill Jackson died of cancer in February 2009.

47.     By the summer of 2008, Bill Jackson's health had deteriorated substantially as a result of the cancer.

48.     In or around August 2008, Bill Jackson permitted Phil Jackson to take the Vehicle to Lost 'N The 50's, a classic car museum and consignment business located in Neosho, Missouri ("Lost 'N The 50's") to place the car up for sale on behalf of Bill and Phyllis Jackson.

49.     Phyllis Jackson signed a document purporting to "give Phil Jackson full control over" the Vehicle and the "full authority to drive, oversee, and to sell this car at the price he feels fair while said vehicle is located at Lost 'N The 50's in Neosho, Missouri" (the "Authorization").  The date Phyllis Jackson signed the Authorization is uncertain, except that she signed it prior to Phil Jackson's delivery of the Authorization to Lost 'N The 50's and within a few weeks following Phil Jackson's delivery of the Vehicle to Lost 'N The 50's in August 2008.

50.     In September 2008, Bill and Phyllis Jackson engaged Dwight Douglas, an attorney then in private practice in Neosho, Missouri, to represent them for estate planning purposes.  Bill Jackson's health was deteriorating at this time.

51.     On or about September 25, 2008, Bill Jackson told Dwight Douglas that he and his wife Phyllis Jackson had used substantially all of their savings to purchase the Vehicle; and that the couple intended to sell the Vehicle and use the sale proceeds to provide for Phyllis Jackson following Bill Jackson's death.

**M.     Lost 'N The 50's**

52. Lost 'N The 50's is owned and operated by Dale Stanley.

53. In August 2008, Phil Jackson delivered the Vehicle to Dale Stanley at Lost 'N the 50's to place the Vehicle up for sale on behalf of his parents. On this same date, Phil Jackson also delivered to Dale Stanley certain Vehicle-related paperwork. This paperwork did not contain the Title or the Authorization.

54. When delivering the Vehicle to Lost 'N The 50's, Phil Jackson signed a Consignment/Purchase Agreement with Lost 'N The 50's, dated August 16, 2008.

55. Phil Jackson signed the Consignment/Purchase Agreement in the block designated "owner" of the consigned property.

56. The Consignment/Purchase Agreement contains a consignment sales price of $700,000.00.

**N.     The Seizure**

57. On March 11, 2009, the Internal Revenue Service obtained from this Court a Writ of Entry on Premises to Effect Levy to enter into Lost 'N the 50's and seize an automobile owned by Phil Jackson (the "Writ of Seizure").

58. Phil Jackson previously owned a 1969 Dodge Charger Daytona similar to the Vehicle at issue in this case. The VIN number of the 1969 Dodge Charger Daytona previously owned by Phil Jackson is "XX29J9B379743" (the "Other Charger").

59. At the time the IRS obtained the Writ of Seizure, its intention was to seize the Other Charger which it thought was the Dodge Charger Daytona located at Lost 'N The 50s.

60. During the course of executing the Writ of Seizure on or about March 17, 2009, at Lost 'N The 50s, the IRS located the Vehicle at issue in this case.

61. The IRS seized the Vehicle on March 17, 2009.

62. At the time the IRS seized the Vehicle, the IRS had no knowledge of any kind concerning Bill Jackson and Phyllis Jackson's purchase and ownership of the Vehicle.

## CONCLUSIONS OF LAW

**I. Plaintiff Met Her Burden at Trial to Show that She Owns the Vehicle**

"In 26 U.S.C. § 7426, Congress has given third parties the right to bring an action against the United States when it is shown property was wrongfully seized pursuant to levy by the IRS." *Sec. Counselors, Inc. v. United States*, 860 F.2d 867, 869 (8th Cir. 1988); *see* 26 U.S.C. § 7426(a)(1) ("If a levy has been made on property or property has been sold pursuant to a levy, any person (other than the person against whom is assessed the tax out of which such levy arose) who claims an interest in or lien on such property and that such property was wrongfully levied upon may bring a civil action against the United States in a district court of the United States").

To prevail on a wrongful levy claim, a plaintiff must show: (1) that she has an interest in or a lien on the property at issue, and (2) that the levy was wrongful. *Sec. Counselors, Inc.*, 860 F.2d at 869; *Schnarr v. United States*, 795 F. Supp. 934, 936 (E.D. Mo. 1992). The first of the two requirements ensures standing, while the second focuses on the condition precedent to government seizure, namely, that the property seized was that of the taxpayer. *Sec. Counselors, Inc.*, 860 F.2d at 869. "A levy is wrongful where the money or property levied upon 'does not in whole or in part belong to the taxpayer against whom the levy originated.'" *Schnarr*, 795 F. Supp. at 936 (quoting *Arth v. United States*, 735 F.2d 1190, 1193 (9th Cir. 1984)); *see also Rosenblum v. United States*, 549 F.2d 1140, 1145 (8th Cir. 1977) (noting the phrase "wrongfully levied upon," as used in § 7426(a)(1), means "seized wrongfully in relation to the third person who is bringing the suit and not merely wrongful in relation to a taxpayer who may suffer from

9

the collateral effects of the seizure"). In a wrongful levy action, the initial burden of proof is on the plaintiff to establish that she had title or ownership of the property levied against. *Rivera v. United States*, 835 F. Supp. 632, 634 (S.D. Fla. 1992). After such a showing, "the burden of proving the connection between the taxpayer and the property at issue is on the government," and the Government must make such a showing by substantial evidence. *Id.* The plaintiff, however, retains the ultimate burden of persuasion that the levy should be overturned. *Id.*

At trial, Plaintiff submitted substantial testimonial and documentary evidence showing, among other things, that the Vehicle had been purchased by her husband with $250,000.00 in marital funds in August 2003; that the source of the money used to purchase the Vehicle came from the sale of real estate by Plaintiff and her late husband in June 2003; that her late husband was acting for and on behalf of both himself and Plaintiff at the time he purchased the Vehicle; that the couple obtained and signed an original State of Indiana title for the Vehicle; the Vehicle was jointly owned by Plaintiff and her late husband from the date of purchase in August 2003 until he passed away in February 2009; that Plaintiff and her husband retained the right to control the Vehicle at all times; and that her son, Phil Jackson, does not have and never has had an ownership interest of any kind in the Vehicle.

## II. Plaintiff Became the Sole Owner of the Vehicle Upon Her Husband's Passing

In Missouri, the presumption is that property owned jointly by married persons, including personal property, is held as a tenancy by the entirety. *Scoville v. United States*, No. 94-0936-CV-W-6, 1999 WL 1424995, at *10 n.6 (W.D. Mo. Dec. 3, 1999); *Cann v. M & B Drilling Co.*, 480 S.W.2d 81, 85 (Mo. Ct. App. 1972). This presumption of ownership by the

entirety can be overcome only by competent evidence "which is so unequivocal as to leave no doubt the intent of the parties was otherwise." *Cann*, 480 S.W.2d at 85.

Plaintiff is entitled to the presumption in this case that she and her husband owned the Vehicle in tenancy by the entirety because: (1) the married couple jointly owned the Vehicle, (2) the Vehicle was purchased with funds from a jointly owned bank account, and (3) no evidence was submitted at trial evidencing a different intent. Property held in tenancy by the entirety, like the Vehicle in this case, "is not held by moieties or halves but both husband and wife hold the entire estate as a single person. Therefore, a surviving spouse succeeds to the whole estate, not by virtue of survivorship, but because there is no other spouse with whom to share the title." *Matter of the Estate of Hughes*, 735 S.W.2d 787, 791 (Mo. Ct. App. 1987); *see also In re Sumpter*, 241 B.R. 640, 643 (Bankr. W.D. Mo. 1999). Accordingly, Plaintiff became the sole owner of the Vehicle upon the death of her husband in February 2009.

## III.     Defendant Did Not Meet Its Burden to Show a Nexus Between Phil Jackson and the Vehicle

Defendant did not submit substantial evidence at trial showing that Phil Jackson currently has or ever has had an ownership interest of any kind in the Vehicle. To establish prima facie evidence of ownership, the Government must show that Phil Jackson had "exclusive possession and control" of the vehicle. *State v. Patchen*, 652 S.W.2d 265, 267 (Mo. Ct. App. 1983). The evidence at trial did not show that Phil Jackson had exclusive possession and control over the Vehicle. The evidence at trial showed only that Plaintiff and her late husband entrusted the Vehicle to their son Phil Jackson to store, maintain and market the Vehicle on their behalf because he had a suitable storage building and his parents did not; because he knew how to store

11

and maintain the vehicle and his parents did not; and because he had knowledge of how to locate potential buyers for the Vehicle and his parents did not.  There was no evidence showing that Phil Jackson had the right to drive or use the vehicle as he saw fit, or that he did regularly use or drive the vehicle.

IV.     There Was No Wrongdoing on the Part of the United States

Bill and Phyllis Jackson, whether knowingly or not, are responsible for allowing their son Phil Jackson to create the appearance that he owned the vehicle in question.  It is understandable that with the information available to them under the circumstances that existed at the time that the IRS agents would conclude that the Vehicle belonged to Phil Jackson and should be seized. It is only after the gathering of evidence pursuant to this action that the Jacksons' ownership has been established.  In other words, the Jacksons brought this on themselves.

## ANALYSIS

This case has its share of innuendo and intrigue.  The evidence is strong that Phil Jackson has a history of avoiding taxes, and there are circumstances related to the car purchase in this case that would raise an inference that Bill Jackson was trying to avoid paying sales tax.  The paper trail was not normal.  All things considered, the Government had every reason to be suspicious of the ownership of the Vehicle when it was seized at Lost 'N The 50s.

Now, in light of all the evidence that has been gathered, and regardless of their motives on collateral issues not before the Court, the issue of ownership of the Vehicle does not seem near as complex as the parties suggest.  It is undisputed that Bill Jackson withdrew $300,000 cash from a joint bank account he maintained with his wife Phyllis.  This money came from the sale of real estate they had owned jointly.  Bill Jackson traveled to Wisconsin with his son Phil

and paid $250,000 to Dr. T.J Flatley for the purchase of the Vehicle. Upon his return to Missouri, Bill Jackson deposited the remaining $50,000 back into the joint bank account. The Government makes much of the fact that the Jacksons' son Phil was instrumental in putting this deal together. I have no doubt he was. He has a history of dealing with collectable cars and selling them for significant profit. I don't find it to be unusual that parents would utilize their son's expertise in this manner. The Government claims the paper trail for this Vehicle while it was in the Jacksons' possession is fraught with falsifications and omissions that indicate Phil Jackson was the real owner. Phil Jackson and his wife drove their car trailer to Wisconsin to pick up the car, hauled it to their house and stored it in a temperature controlled storage barn that he used to store his own collectable cars. Again, I find this to not be unusual under the circumstances of this case. Bill and Phyllis Jackson did not have a trailer, they did not have a suitable storage facility and their son lived just a short distance from them. It is not a stretch that parents and their son would cooperate in this type of arrangement.

The Government argues that Phil Jackson acted as if he was the owner, e.g., talked to appraisers as if the Vehicle was his, took the Vehicle to shows as if it was his own, and signed papers at Lost 'N The 50s in signature blocks for the "owner." All of these factors raise concerns. They are either serious badges of fraud as claimed by the Government, or a loose handling of his parents' investment by son Phil. There was also evidence that Phil caused a notary to backdate and notarize his mother's signature, may have had his mother sign an authorization for sale of the Vehicle after the fact, and may have puffed his testimony some to support his mother getting the return of the Vehicle. Were these acts in support of an elaborate scheme, or a son trying to scramble and help his mother after his loose handling of their

13

investment put it at risk of loss?  We must keep in mind that Phil Jackson's bad acts standing alone do not change the ownership of the Vehicle.  Part of this case involves this Court's assessment of the evidence presented at trial, including the testimony of the witnesses.  I found Phyllis Jackson's testimony to be credible and reasonable.  The long and short of my conclusion is that Phil Jackson did handle the Vehicle as if it was his own.  This made it much easier to do the things he did with it, but it does not change the fact that it was his parents' investment.  There was absolutely no credible evidence that the $250,000 came from anyone other than Bill and Phyllis Jackson.  Also, there was no credible evidence that they ever intended to gift this investment to their son Phil.  It is not uncommon for parents and children to operate with a trust in each other and sharing of resources and efforts not found in other business relationships.

The Government suggests many negative inferences from the facts to support its listing of badges of fraud.  I suggest the following inferences that are just as well-grounded as those made by the Government:

1. There was no logical reason for Bill Jackson to accompany his son Phil on the trip to Wisconsin to inspect and buy the Vehicle unless it was because he intended to have an ownership interest.  There was no evidence that he had "tagged along" on any other such trip when Phil Jackson purchased his own cars.

2. There was no logical reason for Bill Jackson to prepare and sign the document dated September 1, 2003, in which he agreed that he paid $250,000 for the Vehicle, and that if it sold for more than the purchase price before September 1, 2004, Phil would get 50% of net proceeds, and that Phil could purchase the Vehicle for $250,000 any time before September 1, 2004, unless he had an

ownership interest. Maybe their intent was for Bill and Phyllis to buy the car and hold it for a year to let son Phil get his IRS problems resolved and then buy the car from them. It would not change the fact that Bill and Phyllis owned the Vehicle. The agreement expired on September 1, 2004.

3. If one were to claim the circumstances described in 1 and 2 above reflect an elaborate scheme set up by Bill and Phil Jackson to disguise the fact that Phil was really the purchaser of the Vehicle, it makes no logical sense that Phil Jackson later would be so loose about activities that caused others to believe he was the owner. In other words, one would expect that if the front end was all an elaborate scheme, then Phil surely would have been consistent in the following years and caused all documents and his own conversations to reflect that Bill and Phyllis Jackson were the owners.

All things considered, and for the reasons stated above, I find for Plaintiff Phyllis Jackson.

## **CONCLUSION**

For the reasons stated herein, the Court finds Plaintiff has proven the levy was wrongful in this case. Accordingly, the Court hereby ORDERS the following:

1. Judgment is entered in favor of Plaintiff.
2. Pursuant to 26 U.S.C. § 7426(b)(2)(A), the United States is ORDERED to return to Plaintiff Phyllis Jackson the 1969 Dodge Charger Daytona seized by the United States, Vehicle Identification Number ("VIN") XX29J9B383276 (the "Vehicle").
3. There was no wrongdoing by the United States that would justify any award of costs

or damages to Plaintiff and no such order is made.  Each party shall be responsible for their own costs.

**IT IS SO ORDERED.**

DATE: June 15, 2010           */s/ Richard E. Dorr*
                                          RICHARD E. DORR, JUDGE
                                          UNITED STATES DISTRICT COURT